**WO**

SKC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Bret Smith,

                    Plaintiff,

v.

Chino Valley, Town of, et al.,

                    Defendants.

No.  CV-21-08009-PCT-MTL (JZB)

**ORDER**

Plaintiff Bret Smith, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983, asserting federal constitutional and state law tort claims against the Town of Chino Valley ("Chino Valley"), the Chino Valley Police Department ("CVPD"), multiple CVPD and Yavapai County Sheriff's Office ("YCSO") officers and their spouses, and various fictitiously named Defendants and corporations.  (Doc. 1.)[1] Smith's claims arise from an incident on January 22, 2020 when Smith called 9-1-1 because he was suicidal, and CVPD and YCSO officers responded and allegedly handcuffed Smith and took him forcefully to the ground and failed to render proper medical care for his alleged leg injury.  (*Id.*)  Defendants Chino Valley; CVPD Officers and their spouses, Roger and Jane Doe Brown, Bill and Jane Doe Burns, Michael and Jane Doe Garcia, Sergeant Cody and Jane Doe Johnson, Sergeant Clint and Jane Doe Shafer; and YCSO

---

[1] The parties subsequently stipulated to the dismissal of the CVPD, which is a non-jural entity not subject to suit, and Smith's state law claims, leaving only Plaintiff's § 1983 claims against the remaining Defendants.  (*See* Docs. 9, 11.)

Deputy Jesse and Jane Doe Hubble move for summary judgment.  (Doc. 33.)  The Motion is fully briefed.  (Doc. 38, 42). The Court will grant the Motion for Summary Judgment.

## I.        Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

1  **II.   Facts**[2]

2          On January 21, 2020, Smith, who was then 44 years old, was living with his parents

3  in a Chino Valley retirement community.  (DSOF ¶¶ 1−3.)  That night, about 10:00 p.m.,

4  paramedics responded to a call from Smith that his father had passed out from drinking,

5  fell, and was unconscious.  (*Id.* ¶¶ 7−8.)  CVPD Officers Brown and Burns responded to

6  the call.  (*Id.* ¶¶ 5, 8.)  Smith had also been drinking vodka that night.  (*Id.* ¶ 8.)

7          Early the next morning, just before 4:00 a.m., Smith made another 9-1-1 call, stating

8  he had a loaded firearm and was feeling suicidal.  (*Id.* ¶¶ 5, 9.)  Smith said that he did not

9  want to kill himself, but he needed medical attention.  (PSOF ¶ 2.)  Because this was around

10  the time of CVPD's 4:00 a.m. shift change, two CVPD squads responded to the call.

11  (DSOF ¶ 9.)  Fire/paramedics also responded, and YCSO deputies Defendant Hubble and

12  non-Defendant Blakely responded as backup.  (*Id.*)  CVPD and YCSO share a dispatch

13  channel, so they routinely help each other out when it appears a call may warrant multiple

14  officers.  (*Id.* ¶ 10.)

15

16  ───────────────────

17          [2] The facts are taken from Defendants' Statement of Facts ("DSOF") (Doc. 33) and

18  Plaintiff's Separate Statement of Facts ("PSOF") (Doc. 39 at 5−10).  Plaintiff also filed a
   Controverting Statement of Facts, and as required under Local Rule of Civil Procedure

19  56.1(b), for each paragraph of Defendants' Statement of Facts, he stated whether he
   disputes those facts (Doc. 39 at 1−4), but Plaintiff failed to articulate any bases for his

20  disputes or provide "a reference to the admissible portion of the record supporting [his]
   position if the fact is disputed."  LRCiv 56.1(b).  Absent any explanations or support,

21  Plaintiff's blanket disputes are unhelpful and do not create a genuine issue of fact.

22  Although Plaintiff supported the facts in his PSOF with citations to evidence, Plaintiff's
   statements therein lack sufficient context that would permit the Court to readily connect

23  them to the facts in Defendants' Statement of Facts or to the events underlying Plaintiff's
   claims.  Where it is clear from Plaintiff's Statement of Facts how the asserted facts relate

24  to the relevant timeline and sequence of events, the Court will incorporate those facts.

25  Where, however, neither the timeline, context, relevance, nor relationship of Plaintiff's
   facts to Defendants' facts are clear, the Court will not attempt to incorporate such facts.

26  *See Orr v. Bank of America*, 285 F.3d 764, 775 (9th Cir. 2002) (internal quotation omitted)

27  ("Judges need not paw over the files without assistance from the parties.").

28

CVPD Defendant Sgt. Johnson was the officer in charge, and while at the residence, Johnson formulated a plan to (1) remove Smith's father from the residence for his safety and confirm there were no other occupants besides Smith in the mobile home, (2) separate Smith from any guns, (3) safely obtain control over Smith, (4) have medical personnel evaluate Smith, and (5) have Smith either voluntarily submit to a physical and mental health evaluation or take custody of Smith and proceed with involuntary evaluations, as permitted under Arizona Revised Statutes § 36-525 ("Title 36").  (*Id.* ¶¶ 10−11.)

Because Smith was armed, and due to the limited sight lines to the residence and the proximity of other residences, Sgt. Johnson positioned a vehicle as cover and obtained a ballistic shield for additional protection.  (*Id.* ¶ 13.)  The YCSO Deputies assisted by securing the perimeter of the residence.  (*Id.* ¶ 14.)  Shortly after the CVPD Officers arrived, and following dispatch communications with the residents, Smith's father voluntarily exited the mobile home in a robe and underwear and was wandering around outside in the cold.  (*Id.* ¶ 15.)  CVPD Officers put Smith's father in a vehicle for his safety and evacuated him to prevent him from interfering.  (*Id.*)  Afterward, Smith exited the residence and told the officers he put his gun on the porch.  (*Id.* ¶ 16.)  The porch was enclosed with awnings and screens, so its interior was not visible to the officers.  (*Id.*)  Johnson continued communicating with Smith through the vehicle PA system and via dispatch, and he tried extensively to persuade Smith to peacefully exit the residence.  (*Id.* ¶¶ 17−18.)

After about 30 minutes, Smith exited from the carport side of the mobile home, not the front porch.  (*Id.* ¶ 19.)  Non-Defendant YCSO Deputy Blakely approached Smith at Taser point, and other officers approached and confirmed that Smith was unarmed; the officers told Smith they wanted to get him help, but they needed to take precautions.  (*Id.* ¶ 20.)  Defendants YCSO Deputy Hubble and CVPD Officers Brown and Burns went inside to try to locate and secure firearms and found a duffel bag of guns and other guns on the wall but no people inside.  (*Id.* ¶¶ 21, 23.)  While outside, Smith had difficulty keeping his balance and insisted on going back inside, so after the residence was cleared

of visible firearms, the officers outside with Smith allowed Smith to return inside with them. (*Id.* ¶¶ 22, 24.)

Once inside with Smith, Sgt. Johnson patted Smith down and cleared him for weapons, and the officers asked Smith to sit in a chair in the middle of the living room, but Smith insisted on taking a different seat, so Officer Burns searched that seat for weapons and then allowed Smith to sit. (*Id.* ¶ 25; PSOF ¶¶ 6−7.) Instead of sitting, Smith attempted to wander around and was briefly handcuffed until he agreed to cooperate and sit down, at which point the officers removed the handcuffs. (DSOF ¶ 26; PSOF ¶ 8.) Paramedics then came inside and assessed Smith and indicated he should be taken to a medical facility. (*Id.* ¶¶ 27, 28.) While the paramedics were asking Smith questions, Smith asked them whether they found his gun and where they put it. (*Id.* ¶ 29.) Smith also said he was getting "agitated" and "pissed off" but would not say why. (*Id.* ¶ 30.) He also said he was having an anxiety attack and became argumentative. (*Id.* ¶ 31.)

Smith stood up and approached Officer Burns; then, after repeated requests from the officers, sat back down. (*Id.* ¶ 32.) Smith told the paramedics he was suicidal, drank a lot, and had various health problems, such as back issues, blood pressure issues, Type 2 diabetes, and was "off his meds" and had not checked his blood sugar in a few days. (*Id.* ¶ 33.) The officers, who had been on the scene for over one hour by now, tried to convince Smith to voluntarily go with the paramedics for medical and mental health treatment, but Smith said "no" and "I am not going to the hospital." (*Id.* ¶ 34.) The officers told Smith he had to go to the hospital and did not have a choice. (*Id.* ¶ 35.) They told him that, at the hospital, he would get fluids, get his heart rate down, and would be helped to feel better, but Smith still said "no." (*Id.* ¶ 36.)

Smith asked the officers if they had "cleared the weapons" and asked them where the weapons were, and when the officers told him the weapons were secure, Smith said, "that's my business." (*Id.* ¶ 37.) He said he was allowed to have guns in the house, and he demanded their return. (*Id.* ¶ 38.) The officers again told Smith he needed to go to the hospital to be mentally evaluated and did not have a choice, and Smith said "no" and asked

if the officers wanted to fight. (*Id.* ¶ 39.) He also said, "I fight. I don't want to fight you guys." (*Id.*)

Smith finally agreed to stand up, but when Officer Burns asked Smith to put his hands behind his back, Smith did not comply and again asked if the officers wanted to fight. (*Id.* ¶¶ 40−42.) The officers repeatedly told Smith they did not want to fight but just wanted to get him help. (*Id.* ¶ 43.) Burns tried to handcuff Smith with Sgt. Johnson's help, and due to Smith's size (6 feet, 260 pounds) and resistance, Johnson gave Burns an extra set of handcuffs for additional length. (*Id.* ¶¶ 6, 44−45.) At the time, Burns was 5'3" and approximately 210 pounds; Johnson was 6' and approximately 190 pounds; Sgt. Shafer was 5'10" and approximately 230 pounds; Officer Brown was 5'8" and approximately 180 pounds; and Deputy Hubble was 6'2" and approximately 240 pounds. (PSOF ¶¶ 16−20.) Smith resisted the officers and tried to pull away, and he grabbed, squeezed, and bent Johnson's fingers. (DSOF ¶ 46.)

According to Defendants, while the officers were attempting to gain control of Smith, Smith tried to break free and fell forward. (*Id.* ¶ 48.) Smith first landed on his left leg and knee, and he moaned as soon as he hit the floor and then went down to his left side, and the officers immediately finished handcuffing him behind his back. (*Id*. ¶¶ 50−52.)

According to Smith, he complied when the officers asked him to stand up and turn around, but when asked to put his hands behind his back, he said "no." (PSOF ¶¶ 10−12.) Smith and one of the officers argued about Smith going to the hospital, and Smith asked, "what for?" (*Id.* ¶ 14.) Less than one minute passed from the time Smith was first told to put his hands together for handcuffing and he refused to do so before the five officers quickly moved toward him and grabbed both his hands. (*Id.* ¶¶ 13−14.) Smith did not fall forward; instead, he was needlessly thrown to the ground after the officers already had one of his hands in handcuffs. (*Id*. ¶¶ 15, 21, 24−25.)

After Smith was handcuffed, the officers lifted him to his feet and told him to exit the home. (PSOF ¶ 26.) Smith complained about his leg, saying he was injured and could not walk, so the officers carried him out of the residence and dragged him to the patrol car.

(DSOF ¶ 53; PSOF ¶¶ 27, 29.)  Smith said, "you broke my knee," and Officer Burns responded, "we did not," and Sgt. Johnson took no action upon hearing Smith's complaint that his leg was broken, even though paramedics were still on the scene.  (PSOF ¶¶ 28, 32.)  Smith told the officers multiple times that he was in pain, but he was not checked for any injuries.  (*Id.* ¶¶ 30−31.)

Smith was taken to the police station before he was evaluated by paramedics for his leg pain.  (*Id.* ¶ 34.)  Afterwards, Smith was transported to the Yavapai Regional Medical Center for treatment.  (DSOF ¶ 54.)  Smith claims he fractured his left leg.  (PSOF ¶ 36.)[3]

### III.    Fourth Amendment Legal Standards

#### A.    Fourth Amendment

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.*

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis, assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect was resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary.  *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396−97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).  "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537.  "[W]here it is or should be apparent to the

---

[3] This fact is based on Smith's blanket agreement with an imprecise statement from counsel during deposition that Smith had "fractures" to his left leg, not on any medical evidence, and Smith does not point to any other evidence or first-hand testimony from which to determine the extent of the fracture or "fractures."  (*See* PSOF ¶ 36.)

officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, citing *Terry v. Ohio*, 392 U.S. 1, 20−22 (1968).  This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396−97.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott*, 550 U.S. at 381 n.8.  But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force.  *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).  Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

## B.    Qualified Immunity

Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts

alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

Whether a right was clearly established must be determined "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991). Thus, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right;" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

## IV. Discussion

### A. Excessive Use of Force

Defendants argue that Defendant Officers are entitled to summary judgment on Smith's excessive-use-of-force claims because they had the legal authority under Arizona law to make an arrest, and the amount of force they used to do so was objectively reasonable under *Graham*. (Doc. 33 at 9−10.) Defendants further argue that the officers are protected by qualified immunity because there is no legal precedent that shows their use of force to control and handcuff Smith after he became progressively combative was unconstitutional. (*Id.* at 11.)

#### 1. *Graham* Analysis

##### a. Nature of the Force

To determine whether a Fourth Amendment violation occurred, the Court must first

assess the nature of the force inflicted.  Here, Defendant Officers' use of physical force is subject to genuine dispute, with Defendants relying on the facts set forth in Defendant Officers' declarations, and Smith relying on the facts set forth in his deposition testimony.

Under Defendants' facts, Officer Burns and Sgt. Johnson attempted to handcuff Smith, but Smith tried to break free and then fell forward, hitting the floor with his left leg and knee, and the officers finished handcuffing him, lifted him up, and carried him to the patrol car.  Taking Smith's version of the disputed facts as true, when Smith refused to put his hands together for handcuffing, all five Defendant Officers grabbed him and threw him to the ground so hard that he fractured his left knee.

Defendants, though, have additionally produced bodycam footage to support their version of the facts.  (Doc. 33 at 7−8.)  Where video evidence is available in an excessive use-of-force case, the Supreme Court has stated that courts "should [] view[] the facts in the light depicted by the videotape."  *Scott v. Harris*, 550 U.S. 372, 380−81.  This does not mean that courts no longer take the nonmovant's version of the facts as true where video evidence, seen in a light most favorable to the nonmoving party, leaves room for genuine dispute.  Courts must still draw all reasonable inferences in the nonmovant's favor.  *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).

Video from Officer Burns' bodycam, starting about 52 minutes after Burns' arrival, shows Smith, who is seated in a chair facing Burns, stand up and turn around when asked to do so.  (Doc. 37, Burns Bodycam at 51:40.)  When asked to put his hands behind his back, Smith clearly says, "No."  (*Id.*)  Several officers in black uniforms then approach and take hold of Smith, and clicking sounds can be heard, but most of the video—filmed from behind Smith—is blocked by Smith's back.  (*Id.* at 51:40−54.)  Smith can be heard saying during a struggle, "for what?" and an officer in front of Smith says, "we're here to help

you man," and then, "stop! don't do it!"  (*Id.* at 51:54−52:10.)  During this time, the video briefly shows Burns attempting to pull Smith's hands together while saying to an officer assisting on his left (earlier identified as Sgt. Johnson), "give me another set of cuffs."  (*Id.*)

At this point, Officer Burns and Sgt. Johnson are standing behind Smith, holding his arms, and Burns gets one of the handcuffs on Smith's left wrist and is trying to pull Smith's right wrist closer to the left wrist when Smith yells, "let go of my thumb!"  (*Id.* at 52:10−12.)  As Burns continues to try to pull Smith's wrists closer together, Burns yells, "you need to stop, now!"  (*Id.* at 52:12−14.)  Smith's right wrist is still uncuffed, with either Burns or Johnson pulling the empty handcuff closer to it while Smith appears to be stiffening his arms, which are out to his sides and bowed out at the elbows.  (*Id.*)  Smith's back then suddenly dips forward, and the officers retain their holds on Smith's shoulders and arms as Smith's body pitches forward and down, and Smith lets out a yell.  (*Id.* at 52:16.)  At least two officers in front of Smith, one in a tan uniform, the other in a black CVPD uniform, join Burns and Johnson in kneeling around Smith and holding him down while Burns and Johnson complete handcuffing him.  (*Id.* at 52:16−21.)

It is not clear from the video whether Smith caused his own fall by struggling to break away from Defendant Officers or if the officers pushed or pulled on Smith's shoulders, causing him to fall.  Contemporaneous video from Sgt. Johnson's bodycam is also largely blocked by Smith's back, but when Smith's body pitches forward, Officer Burns's gloved hand can be seen flat against Smith's upper left shoulder blade.  (Doc. 37, Johnson Bodycam at T11:56:13.)  Construing the video evidence in Smith's favor, a reasonable jury could find that Defendant Officers collectively pushed or pulled Smith forward while trying to handcuff him, causing Smith to fall and hit the floor.  Smith's yell as he went down also supports that Smith struck his knee on the floor before going all the way down.  The video evidence does not support, however, that any officers tackled or jumped on top of Smith and shows only that some of the officers were touching him with their hands as he went down, and they used only their hands to hold Smith down until he was fully handcuffed.

1    In terms of severity, Defendant Officers' use of force in taking Smith down
2    resembles the "reverse reap throw" maneuver that involves "tripping the subject from
3    behind to throw him off balance and then 'guiding' him to the ground with both hands,"
4    which the Ninth Circuit described in *O'Doan v. Sanford* as a "modest deployment of
5    force."  991 F.3d 1027, 1033, 1036−37 (9th Cir. 2021).  Without the video evidence,
6    Smith's asserted knee fracture from hitting the floor could support a higher level of force
7    because, although it is the amount of force, not the amount of injury, that matters in the
8    use-of-force context, courts may consider "the severity of injuries in evaluating the amount
9    of force used."  *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018).  Based on the
10   video evidence, though, Defendant Officers did not physically tackle or forcefully slam
11   Smith to the ground or engage in the kind of force intended to or likely to cause severe
12   injury that courts have equated with intermediate to severe force.  *Cf. Carr v. Cty. of San
13   Diego*, No. 19-CV-1139 JLS (MDD), 2021 WL 4244596, at *13 (S.D. Cal. Sept. 17, 2021)
14   ("putting Plaintiff into a headlock, slamming him to the ground, and then having multiple
15   officers put their bodyweight on him would appear to be at least an intermediate use of
16   force"); *see Sheridan v. Trickey*, No. CIV. 10-06034-AC, 2010 WL 5812678, at *5 (D. Or.
17   Dec. 16, 2010), *report and recommendation adopted*, No. CV 10-6034-AC, 2011 WL
18   588769 (D. Or. Feb. 10, 2011) (slamming subject's head against the asphalt with sufficient
19   force to knock him unconscious and fracture his face is at least intermediate force).
20   Lacking any such facts, the level of force employed in this instance to take Smith down
21   was moderate.  Whether such force was reasonable in relation to the government interests
22   at stake requires assessing such factors as the severity of the suspected crime, the threat
23   posed by Smith at the time, and whether Smith was resisting arrest.  *Espinosa*, 598 F.3d at
24   537; *Graham*, 490 U.S. at 396−97.

25                          **b.    Government Interest at Stake**
26          Although Smith had not committed a crime when Defendant Officers used force to
27   take him into custody, it is undisputed he called 9-1-1 and stated he was suicidal and had a
28   loaded firearm; at the time of the encounter with Defendant Officers, he was intoxicated

and agitated; he had multiple guns in the residence, which he continued to ask about even after the officers had secured them; and he refused for nearly one hour after the officers' arrival to go to the hospital to be mentally and physically evaluated. Absent Smith's voluntary agreement, there was a legitimate government interest for Defendant Officers to take Smith into custody under Arizona Title 36, which permits a police officer to take into custody "any individual the . . . officer has probable cause to believe is, as a result of mental disorder, a danger to self or others, and . . . is likely without immediate hospitalization to suffer serious physical harm or serious illness or to inflict serious physical harm on another person." Ariz. Rev. Stat. § 36-525(A).

Smith argues that he did not pose an immediate threat to himself or others when Defendant Officers took him down because he did not attack anyone or threaten to do so, was being "calm and cooperative," and did not have access to a weapon at the time of the takedown. (Doc. 38 at 8.) Smith avoids, however, that Defendant Officers had already been talking to him for about 30 minutes, and Smith had repeatedly refused to go to the hospital despite paramedics indicating he should go to a medical facility, stated he was "agitated" and "pissed off," asked about his guns, was intoxicated, and asked if the officers wanted a fight. Although the danger Smith posed to himself or others was not immediate so long as Defendant Officers remained in the residence and kept Smith from his guns or any other potentially lethal weapons, Smith posed a sufficient threat to himself if Defendant Officers simply left the scene without intervening to justify taking him into custody under Title 36, and Smith does not argue that such an arrest was not justified.

It is also materially undisputed that Smith resisted being taken into custody. Smith repeatedly refused to go to the hospital for a mental and physical evaluation, as the paramedics recommended. Although Smith eventually stood and turned around when Officer Burns asked him to do so, he clearly said "no" when asked to put his hands together behind his back for handcuffing, and Smith does not genuinely dispute that he resisted Burns' and Sgt. Johnson's attempts to handcuff him, including by trying to pull away and grabbing and bending Johnson's fingers. Smith instead argues that he was not actively

resisting arrest because he eventually complied with all the officers' commands, and that he just "needed additional time to comply." (Doc. 38 at 10.) Smith also argues that his refusal to place his hands behind his back was "not a form of real resistance" because "Defendants only gave Smith less than a minute to comprehend what was occurring and comply." (*Id.* at 11.)

Smith concedes, though, that he was at least passively resisting arrest, and he does not dispute that he repeatedly refused to go the hospital before Defendant Officers eventually attempted to handcuff him. (*Id.*) There is also no evidence to support, as Smith suggests, that Smith did not understand Defendant Officers' repeated attempts to persuade him to go to the hospital or that he was confused and needed more time to understand what was being asked of him when Defendant Officers told him to put his hands together behind his back, and he flatly refused. Smith merely speculates that, given more time, he would have eventually complied with this request, but this does not mean he was not resisting at the time or that a reasonable officer on the scene would have had any reason to conclude that, given more time, Smith would have eventually complied without a struggle.

Taken together, the seriousness of the situation, even if not a crime; the danger Smith posed to himself if he did not either willingly go to the hospital or comply with Defendant Officers' attempts to take him there for a physical and mental evaluation; and Smith's verbal and physical refusal to allow Defendant Officers to place him in handcuffs support at least a moderate government interest at stake in taking Smith into custody.

### c.     Reasonableness of the Force Used

As to the reasonableness of the force used, Defendants argue that Smith's "large size, high level of intoxication, increasing combativeness, unpredictability, requests for the return of his guns, and confrontational responses to the police" required Defendant Officers "to use increasing levels of force as Smith increased his resistance," making the force they used to effectuate Smith's lawful arrest objectively reasonable. (Doc. 33 at 10.)

Smith argues that Defendant Officers' use of force to take him to the ground was unnecessary and excessive because the officers were not responding to a crime, Smith was

1  not actively resisting arrest, Defendant Officers did not warn Smith that they would use

2  force, and they failed to use less intrusive means available to them.  (Doc. 38 at 9−13.)

3      As discussed, the fact that Defendant Officers were not responding to a crime does

4  not diminish the government interest at stake under the facts presented here.  The Arizona

5  Legislature's enactment of Title 36 itself indicates a strong governmental interest in

6  protecting citizens of the state from harm, including self-harm, as was at issue here.

7  Further, even though Smith claims he was only passively resisting arrest when he refused

8  to place his hands together behind his back and then physically resisted Defendant Officers'

9  attempts to handcuff him, "the right to make an arrest or investigatory stop necessarily

10  carries with it the right to use some degree of physical coercion or threat thereof to effect

11  it."  *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22– 27 (1968)).  Resorting

12  to some degree of physical force to take Smith into custody after he verbally and physically

13  resisted being handcuffed was therefore reasonable, and the absence of a criminal offense

14  or active physical aggression does not change this analysis.

15      Smith's arguments that it was objectively unreasonable for Defendant Officers not

16  to warn him before taking him down to the floor are also unpersuasive.  In assessing

17  whether a use of force is reasonable, courts "consider whether officers gave a warning

18  before employing the force."  *Glenn v. Washington Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011)

19  (citing *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) ("police officers normally

20  provide . . . warnings where feasible, even when the force is less than deadly, and . . . the

21  failure to give such a warning is a factor to consider" in the overall use-of-force analysis)).

22  Here, though, Defendant Officers' takedown of Smith occurred after the officers made

23  clear they intended to handcuff Smith, and Smith refused a direct order to put his hands

24  together and then physically resisted the officers' attempts to place him in handcuffs.

25  Although the officers did not specifically warn Smith they would take him to the ground if

26  he continued to resist, at least one officer can be heard on video during the struggle telling

27  Smith, "stop! don't do it," and Defendant Burns can be heard yelling, "you need to stop,

28  now!" just before Smith is either pushed or pulled to the ground on his knee.  (Burns

Bodycam at 51:54−52:14.)  Smith also does not materially dispute that, during this struggle, he tried to pull away and grabbed, squeezed, and bent Sgt. Johnson's fingers. (DSOF ¶ 46.)  By contrast, the line of cases Smith relies on to show that the lack of a more specific warning was unreasonable involve sudden, instantaneous uses of significantly greater force on non-combative subjects when the officers had ample time and opportunity to issue a warning before resorting to any force.  *Cf. Bryan*, 630 F.3d at 831 ("it is undisputed that Officer MacPherson failed to warn Bryan that he would be shot with the X26 if he did not comply with the order to remain in his car"); *Glenn*, 673 F.3d at 876 ("It appears that the only warning given immediately before the beanbag shotgun was fired was when Pastore yelled "beanbag, beanbag."  Possibly, Lukus did not know what this statement meant, or perhaps even what a beanbag shotgun was"); *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001) ("it is not objectively reasonable" for officers to shoot a person walking quickly toward an officer with a can or bottle in his hand "when the officer neither orders the individual to stop nor to drop the can or bottle, and does not even warn him that he will be fired upon if he fails to halt").  These cases do not show that Defendant Officers' failure to expressly warn Smith during a physical struggle they would take him to the ground if he did not stop resisting was objectively unreasonable.

Finally, Smith is correct that Defendant Officers were required to consider whether there were any "clear, reasonable, and less intrusive alternatives" available to effect the arrest.  *Bryan*, 630 F.3d at 831.  But police officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."  *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . . [and] would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves. . . . [when acting] under stress and subject to the exigencies of the moment."); *see also Forrester v. City of San Diego*, 25 F.3d 804, 807–08 (9th Cir. 1994) (police officers "are not required to use the least intrusive degree of force possible. . . . the inquiry is whether the force that was

used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer on the scene") (citing *Graham,* 490 U.S. at 396).

To show that Defendant Officers failed to consider less intrusive alternatives, Smith cites to Police Executive Forum ("PERF") Module V-53, Activity 9:1, which he identifies as "the Model Policy," from the report of his expert, 30-year police veteran Charles W. Drago.  (Doc. 38 at 13; Doc. 39-1 at 111.)  This policy states,

> 1. When taking the individual into custody or to a police vehicle for the purpose of transport, officers should make every reasonable effort to protect the person's health and safety.

> 2. If a person's behavior poses an imminent risk of serious harm to self or others, officers may need to take reasonable steps to physically restrain the person.  **Restraints should only be used as a last resort.**  If time permits, guidance from a mental health professional should be sought about the best restraint methods for the person and situation.

> 3. The behavior of a person who has mental illness may change rapidly.  Officers should recognize that an individual's level of cooperation may change suddenly.  **Unless there is immediate danger to the individual, others or officers, responding officers should be deliberate and allow the person time to calm down in an effort to gain voluntary cooperation before resorting to physical restraints.**  While recognizing that the person is ill, officers must remember that safety is paramount.

(Doc. 38 at 13 (emphasis added by Smith).)

Smith argues that it is "very clear" from this policy that Defendant Officers did not allow for alternative approaches, and that "had the Officers allowed time for [Smith] to cooperate with his detention and/or voluntarily go to the hospital, there would have been no need for the restraints and the violent throw down."  (Doc. 38 at 13.)

Defendants argue that the PERF "model policy" is improperly cited and inadmissible, and to the extent Smith uses it to suggest that he should not have been handcuffed, it is standard and universal practice to use handcuffs on a subject being

involuntarily transported.  (Doc. 42 at 7.)[4]  Defendants also argue that "Smith's suggestion that the police should have taken more time is speculative and baseless, and it is irrelevant to whether the actual use of force was proper."  (*Id.*)

Smith's reliance on a proposed model policy to show that Defendant Officers failed to consider lesser available uses of force is unpersuasive.  The Fourth Amendment "reasonableness" standard as set forth in *Graham*, et.al., not internal department policies or proposed model policies, set the standard for evaluating the proper use of force, which is whether the force used was reasonable "judged from the perspective of a reasonable officer on the scene."  490 U.S. at 396.  Additionally, although applicable Ninth Circuit caselaw requires police officers to evaluate whether less intrusive alternatives are available, police officers are not required to use the least amount of force possible to effectuate an arrest, particularly when the subject resists, creating a tense, rapidly evolving situation, as happened here.  *See Scott*, 39 F.3d at 915; *Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").  The undisputed evidence also shows that Defendant Officers tried for some time to persuade Smith to go to the hospital voluntarily before they attempted to take him in against his will, and even then, they only resorted to physical force when Smith resisted their efforts to

_____

[4] Defendants are correct that Smith did not properly cite to this evidence in his Response, but neither did Defendants cite to any authority to show what is standard practice in these situations.  As to Smith's expert report and model policy evidence being inadmissible, Defendants only flesh out this and other arguments related to Plaintiff's expert in a "Response to Plaintiff's Separate Statement of Facts" (Doc. 40), which goes beyond the filings permitted in the Local Rules of Civil Procedure 7.2(m)(2) and 56.1(b).  Defendants also did not move to exclude Smith's expert.  The Court will therefore only consider Defendants' objections to Smith's Separate Statement of Facts and expert report that are properly set forth in their Reply.  In any case, the Court need not address Defendants' arguments that the expert report or the PERF model policy are inadmissible because, to the extent Smith relies on this evidence in his Response, it does not show that Defendant Officers' use of force was objectively unreasonable.

handcuff him.  These facts do not show that Defendant Officers failed to consider lesser intrusive alternatives or that the force they used to place Smith in handcuffs after he resisted, including taking him to the ground, was objectively unreasonable under the circumstances.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment.  *Graham*, 490 U.S. at 396 (citations omitted); *see also Forrester*, 25 F.3d 804, 807–08 ("the inquiry is whether the force that was used to effect a particular seizure was reasonable . . . .  Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue.").

In summary, Defendant Officers' arrest of Smith under Arizona Title 36 after Smith refused to voluntarily go to the hospital for a mental and physical evaluation was reasonably related to the legitimate government interests in ensuring Smith's safety at the time.  When Smith refused to comply with police orders to place his hands behind his back for handcuffing, it was also objectively reasonable for Officer Burns and Sgt. Johnson to grab Smith's wrists and attempt to handcuff Smith using two sets of handcuffs behind his back, and it was objectively reasonable for the officers to abruptly push or pull Smith down to the ground on his knee when Smith continued to resist.  Defendant Officers' actions therefore did not constitute a Fourth Amendment violation.

### 2.    Qualified Immunity

In the alternative, even if a reasonable jury could find that Defendant Officers' use of force was objectively unreasonable, Defendant Officers would be entitled to qualified immunity because Smith fails to show that their use of force violated any clearly established rights of which a reasonable officer would have known at the time.

Framed in a light most favorable to Smith, the right at issue here is the right of an intoxicated and/or mentally unstable 6-foot, 260-pound man not to be thrown to the ground with sufficient force to fracture his knee when the subject verbally refuses to be handcuffed and then physically resists two officers' attempts to pull his hands together.  A finding of qualified immunity does not require "a case directly on point, [but] existing precedent must

have placed the statutory or constitutional question beyond debate." *Ashcroft v. al– Kidd*, 563 U.S. 731, 741 (2011).

Smith does not address the "clearly established" prong of the qualified immunity test, but he cites to several cases throughout his Response involving uses of force on unarmed subjects to argue that Defendant Officers' use of force was unreasonable, *e.g., Glenn*, 673 F.3d 864; *S.R. Nehad v. Browder*, 929 F.3d 1125, 1134 (9th Cir. 2019); *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005). None of these cases, however, factually resembles the circumstances presented here, and these cases would not have put a reasonable officer on notice that Defendant Officers' uses of force to take Smith into custody violated a clearly established constitutional right.

*Glenn* and *Browder* both involved the use of lethal and/or "less-lethal" force[5] in which the courts found genuine disputes of material fact whether the subjects were armed or posing a threat before the officers shot them. In both cases, the Ninth Circuit concluded that, resolving these facts in favor of the plaintiffs, the use of such extreme force was unreasonable. *Glenn*, 673 F.3d at 879 (9th Cir. 2011) ("there are material questions of fact about Lukus' and the officers' actions that preclude a conclusion that the officers' [use of a less-lethal weapon and] rapid resort to deadly force was reasonable as a matter of law"); *Browder*, 929 F.3d at 1139 ("Viewing the evidence in the light most favorable to Appellants, we conclude that a rational trier of fact could find that Browder's use of deadly force was objectively unreasonable.").

*Smith* involved a police canine attack on an unarmed domestic violence suspect who did not posean immediate threat to anyone but refused to follow police commands. In *Smith*, the plaintiff argued that the use of the canine constituted deadly force, and the Ninth Circuit, while not deciding that issue, concluded that "considering the evidence in the light most favorable to Smith, a reasonable jury could find that the defendants used excessive

---

[5] "Less-lethal" as opposed to "non-lethal" force in this context involves the use of ammunition such as a "bean bag" that can cause serious bodily injury, and in some cases, death. *Glenn*, 673 F.3d at 871.

1    force." 394 F.3d at 707 (9th Cir. 2005).

2        Smith primarily relies on these cases to show that, because he did not have access

3    to his guns during this encounter and did not overtly threaten Defendant Officers but only

4    failed to comply with their commands, Defendant Officers should have known that using

5    any force on Smith was unreasonable. This proposition is not supported by the above cases,

6    which involved sudden uses of far more extreme force on unarmed subjects than is in

7    evidence here. Plaintiff also fails to cite to any cases involving handcuffing and a physical

8    takedown of an unarmed, resisting subject during a lawful arrest that would show it was

9    "clearly established" that these actions by Defendant Officers constituted a constitutional

10   violation. Accordingly, even if a constitutional violation occurred, Defendant Officers

11   would be entitled to qualified immunity, and the Court will grant summary judgment to

12   Defendant Officers on Smith's excessive-use-of-force claim.

13        **B.    Failure to Provide Medical Care**

14        Smith also alleged that Defendant Officers violated his constitutional rights by

15   failing to provide proper medical care when he complained of pain and told them his leg

16   was broken. Like uses of force at the time of an arrest, an officer's failure to provide

17   medical care to an arrestee is analyzed under the Fourth Amendment's objective

18   reasonableness test. *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1098 (9th

19   Cir. 2006) (citing *Graham*, 490 U. S. at 395.) To prevail on a claim under this standard, a

20   plaintiff must show that an arresting officer failed to respond to a medical need posing a

21   substantial risk of serious harm, even though "a reasonable official in the circumstances

22   would have appreciated the high degree of risk involved— making the consequences of the

23   defendant's conduct obvious." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 669 (9th

24   Cir. 2021) (applying objective reasonableness test to a pre-trial detainee's Fourteenth

25   Amendment medical care claim) (cleaned up). Just as the Fourth Amendment does not

26   require officers to use the least amount of force when making an arrest, it does not require

27   an officer "to provide what hindsight reveals to be the most effective medical care for an

28   arrested suspect." *Tatum*, 441 F.3d at 1098. Instead, "a police officer who promptly

summons the necessary medical assistance following an arrest has acted reasonably for purposes of the Fourth Amendment." *Id.* at 1099; *Borges v. City of Eureka*, No. 15-CV-00846-YGR, 2017 WL 363212, at *7 (N.D. Cal. Jan. 25, 2017). ("Although taking Borges to the hospital may have been the most effective medical care for him in hindsight, this is not required by the Fourth Amendment").

Defendants argue that Defendant Officers did not fail to promptly provide medical attention to Smith following his arrest because they immediately transported him to the police station, where he was triaged by paramedics, and the paramedics then transported him to the hospital. (Doc. 42 at 8.)

Smith argues that he repeatedly told Defendant Officers he was in pain, he thought his leg was broken, and he could not walk, and that "any reasonable officer would know that forcing Smith to put weight on a broken leg under these circumstances would constitute excessive force." (Doc. 38 at 14.) Smith cites to the standard in *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986) and subsequently adopted in *Tatum*, 441 F.3d at 1099, and applied in *Estate of Cornejo ex rel. Solis v. City of Los Angeles*, 618 F. App'x 917, 920 (9th Cir. 2015), that police officers must respond to a detainee's arrest-related injuries "by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Maddox*, 792 at 1415. Smith does not dispute, however, that Defendant Officers both "summoned the necessary medical help" for him as soon as they arrived at the police station and sent him to the hospital. Instead, he appears to argue that it was objectively unreasonable for them to first transport him to the police station rather than to ask the paramedics to evaluate his leg complaints on site. (Doc. 38 at 14−15.)

As to Smith's argument that Defendant Officers forced him to place weight on a broken leg, there is a genuine factual dispute whether Defendant Officers carried Smith or, as Smith claims, "dragged" him to the patrol car. (DSOF ¶ 53; PSOF ¶ 29.) Smith does not point to any evidence, though, that Defendant Officers forced him to place weight on his left leg or that their physical efforts to get him into the patrol car when he told them he could not walk caused him further injury. Smith also has not produced any medical

evidence of his fracture or fractures from which the Court could infer he needed immediate medical attention, such that it was objectively unreasonable for Defendant Officers to take him to the police station and not directly to the hospital.  Absent any evidence that Smith had an objectively serious medical need that required immediate attention or that the delay in care caused him harm, Smith fails to create a genuine issue of fact that Defendant Officers acted unreasonably or contrary to firmly established law.  *See Borges*, 2017 WL 363212 at *7 ("[P]laintiff has offered no authority to suggest that the only reasonable course of action is to take the arrestee to the hospital rather than a nearby jail.").

Because Smith's claims against Defendant Officers based on excessive use of force and failure to provide proper medical attention fail as a matter of law, the Court will grant summary judgment to Defendant Officers and dismiss them from this action.

### C.    *Monell* Claim Against Chino Valley

Defendants argue, and Smith concedes, that the evidence does not support a *Monell* claim against Chino Valley, which requires proof of an unconstitutional policy or practice of the City (Doc. 33 at 12; Doc. 38 at 16), so the Court will likewise grant summary judgment to Defendant Chino Valley.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 33), and the Motion is **granted**.

(2)    This action is **dismissed** with prejudice; the Clerk of Court is directed to enter judgment accordingly.

Dated this 4th day of August, 2023.

Michael T. Liburdi

United States District Judge